IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **COMMUNITYCARE HMO, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  06-CV-197-TCK-SAJ |
| | ) | |
| **MEMBERHEALTH, Inc., COMMUNITY** | ) | |
| **CARE RX, LLC**, **NATIONAL** | ) | |
| **COMMUNITY PHARMACISTS** | ) | |
| **ASSOCIATION,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court is Plaintiff's Motion for Temporary Restraining Order and Temporary Injunction ("Motion for TRO") (Docket Nos. 13 and 16) and Defendants' Motion to Dismiss Plaintiff's First Through Fourth and Sixth Claims for Relief ("Motion to Dismiss") (Docket No. 12). The Court held a hearing on the Motion for TRO on Wednesday, May 3, 2006.

**I.      Factual Background**

A.      The Parties

Community Care HMO, Inc. ("CCHMO") is a business located in Tulsa, Oklahoma that has offered managed health care plans to Oklahomans since 1993.  It has offered coverage to Medicare beneficiaries since 1998.  From 1993 to the present, CommunityCare has used the name and trademark "CommunityCare" to market its products and services.  One of the centerpieces of its business is its Medicare Advantage plan, called the Senior Health Plan.  The Senior Health Plan is a Medicare Part C plan, which means that it is a managed care alternative to traditional Medicare that replaces coverage under Medicare Parts A and B pursuant to a 1997 amendment to the Medicare

legislation.[1]  Part C plans, such as CCHMO's Senior Health Plan, cover all of the benefits of traditional Parts A and B and also provide additional benefits that traditional Medicare does not cover.

Beginning in January 2006, a new outpatient prescription drug benefit became available to Medicare beneficiaries.  This prescription drug program is known as Medicare Part D.  Medicare Part D is the first Medicare plan that covers prescription drugs that are not used on an inpatient basis.

Over the last two years, the Center for Medicare and Medicaid Services ("CMS") created a comprehensive national program to deliver Part D prescription drug benefits to seniors.  One way seniors can receive Part D coverage is as part of their current managed health care plan, such as the Senior Health Plan offered by CCHMO.  For example, all CCHMO managed health care plan participants were, as of January 1, 2006, automatically enrolled in CCHMO's new, add-on Part D Senior Health Plan.

Another way seniors can receive Part D coverage is by enrolling in a "stand-alone" Part D plan.  In September 2005, after submitting a bid and undergoing a rigorous regulatory approval process through CMS, Defendant MemberHealth, Inc. ("MemberHealth") became one of only ten entities awarded a contract by CMS to provide this "stand-alone" Medicare Part D coverage across the country.  Thus, MemberHealth recently entered the Oklahoma Medicare market to offer stand-alone Part D coverage to seniors.  The Part D plan name that was approved by CMS for MemberHealth, and the name that was printed on all of MemberHealth's national marketing

---

[1]  Medicare Part A primarily covers services associated with inpatient hospital care. Medicare Part B is generally called "medical insurance" and covers other medical care, such as physician services, laboratory tests, physical therapy, and ambulance services.

materials, was "Community Care Rx."[2]  Pursuant to CMS rules, MemberHealth could not begin marketing its Part D plan until October 1, 2005.  The official enrollment period began on January 1, 2006 and concludes on May 15, 2006.

B.    The First Lawsuit

The initial case, *CommunityCare HMO, Inc. v. MemberHealth, Inc.*, 05-CV-630-TCK, was filed on November 4, 2005 and removed to this Court on November 8, 2006.  In that case, CCHMO alleged that MemberHealth was marketing its Medicare Part D prescription drug plan in Oklahoma using a name that violated federal and state law and that would cause confusion among Oklahoma consumers.    Specifically, CCHMO alleged that the name being used by MemberHealth, "Community Care Rx," was deceptive and confusingly similar to its own name, "CommunityCare." CCHMO moved for a temporary restraining order enjoining Defendants from using the "Community Care Rx" name in the Oklahoma market and asserted causes of action for trademark infringement, unfair competition, and deceptive trade practices.

CCHMO argued that Oklahoma seniors who were confused by the two names stood to inadvertently lose their Parts A, B, and C coverage with CCHMO in the process of signing up for Part D coverage with Community Care Rx.  This is because if an enrollee in CommunityCare Senior Health Plan enrolled in a stand-alone Part D plan, such as that offered by MemberHealth, they would

---

[2] Defendant National Community Pharmacists Association ("NCPA") owns all rights in the "Community Care Rx" trademark.  Defendant Community Care Rx, LLC ("CCRX") is a wholly owned subsidiary of NCPA.  MemberHealth uses the Community Care Rx name for its Part D plan based on an exclusive licensing agreement between MemberHealth and CCRX.  Based on the record before the Court, it is MemberHealth, and only MemberHealth, that is marketing the Part D coverage plan in Oklahoma and the only Defendant that has the power to do so based on its receipt of the federal contract.  Therefore, the Court will limit its order of injunctive relief, which relates exclusively to marketing of MemberHealth's Part D Plan, to Defendant MemberHealth.

be automatically dropped from their CommunityCare Senior Health Plan Part C coverage.  Due to

the similarities in name between CommunityCare and Community Care Rx, CCHMO argued that

new customers, as well as current CommunityCare Senior Health Plan enrollees, could believe they

were keeping their existing coverage and adding Part D coverage with CommunityCare, when in

reality they were not only switching providers to Community Care Rx but also unknowingly losing

all other coverage under Medicare Parts A-C.

     C.    <u>The Settlement Agreement</u>

     On November 17, 2005, the day of the scheduled TRO hearing, the parties entered into a

settlement agreement (the "Settlement Agreement"), whereby MemberHealth agreed to cease using

the "Community Care Rx" name in the Oklahoma market and instead change the name of its plan

to "Community Pharmacists Care Rx" for purposes of the Oklahoma market.  The important

provisions of the Settlement Agreement are set forth in their entirety below:

> 1)    MemberHealth agrees to immediately instruct its enrollers to implement the following actions in Oklahoma:
>
> (a) MemberHealth enrollers will ask each consumer, at the beginning of any contact, if they are currently enrolled in any hospital, medical, or managed care plan, and if so, what plan;
>
> (b) If the consumer identifies CommunityCare HMO or CommunityCare Life and Health Insurance Company, then the following statement will be made to the consumer:
>> "Community Care Rx is a plan associated with MemberHealth, Inc. MemberHealth is headquartered in Ohio and is not associated in any way with the CommunityCare Managed Healthcare Plans of Oklahoma or any of its subsidiaries, headquartered in Tulsa, Oklahoma."
>
> (c) The MemberHealth enroller will point the consumer to the second page of the MemberHealth enroller form where it sets forth what will happen if the consumer is currently enrolled in an MA

Plan.

      (d) If CCHMO learns of any violation of Paragraph 1, CCHMO will promptly notify MemberHealth and MemberHealth will take prompt action to ensure compliance by the enroller with the procedures of this paragraph 1.[3]

2.      Not later than December 1, 2005, MemberHealth shall request approval from [CMS] to modify its Oklahoma marketing materials.  Not later than 30 business days after CMS approval is obtained MemberHealth will implement the revised marketing materials. . . .

3.      Not later than 30 business days after CMS approval, MemberHealth will change the name of its Oklahoma Medicare Part D "Community Care Rx" plan to "Community Pharmacists Care Rx" and CCHMO agrees that the trademark Community Pharmacists Care Rx is not confusingly similar to CCHMO's "CommunityCare" trademark.

. . .

5.      The parties agree to take such action as might be necessary to avoid confusion between MemberHealth and CCHMO.

. . .

7.      CCHMO agrees not to oppose . . . the use or registration . . . other than in the State of Oklahoma, of the Community Care Rx mark . . . .

8.      CCHMO . . . does hereby release, acquit and forever discharge MemberHealth . . . of and from any and all actions, causes of actions, claims and demands of any nature asserted or which could have been asserted in Case No. 05-CV-630 TCK-FHM; provided, however, that this release and discharge shall not affect any rights or obligations pursuant to this Agreement.

(Settlement Agreement, Ex. 1 to Plf.'s Mot. for TRO (footnote added).)  Pursuant to the Settlement

---

[3] The record contains several letters from counsel for CCHMO to counsel for MemberHealth regarding problems perceived by CCHMO during the implementation process.  (*See* Declaration of Joseph Weinstein and attached exhibits, Ex. 1 to Def.'s Resp. to Motion for TRO.)  In every instance, MemberHealth appears to have responded promptly to correct the identified problems. (*See id.*)

Agreement, CCHMO filed a dismissal with prejudice of all claims in Case No. 05-CV-630. The Court did not enter a stipulated judgment or otherwise retain jurisdiction over the claims.

> D.      MemberHealth's Implementation of the Settlement Agreement

From November 18-30, 2005, MemberHealth developed a new logo and marketing materials to be used in the Oklahoma market. On November 30, 2005, MemberHealth submitted these materials to CMS and requested to change its plan name in Oklahoma to Community Pharmacists Care Rx, consistent with the terms of the Settlement Agreement. CMS acted quickly and approved the change on December 7, 2005. Over the next month, MemberHealth generated new enrollment kits, membership packets, banners, and other marketing materials to implement the name change in Oklahoma. MemberHealth avers that it spent in excess of $400,000 in order to make this change in the Oklahoma market.

On January 20, 2006, MemberHealth formally changed the name of its plan in Oklahoma. Prior to that time, there had been communication with all Oklahoma pharmacies and specific instructions to remove all materials containing the previous "Community Care Rx" name. From January 20, 2006 to the present, MemberHealth claims that it has marketed its plan in Oklahoma using the agreed-upon name of "Community Pharmacists Care Rx." MemberHealth claims that any lingering use of the "Community Care Rx" name is the result of omission or error and that they are willing to work with CCHMO to rid the marketplace of any materials containing the former name.

> E.      The Current Lawsuit

On April 7, 2006, CCHMO filed a new lawsuit, Case No. 06-CV-197-TCK-SAJ. CCHMO's Complaint states six claims for relief: (1) common law trademark infringement; (2) false designation of origin, in violation of 15 U.S.C. § 1125(a); (3) common law unfair competition; (4) deceptive

6

trade practices under Oklahoma and common law; (5) breach of contract; and (6) request for order requiring the patent and trademark office to cancel Defendant NCPA's registration of the "Community Care Rx" mark.  CCHMO's allegations are that MemberHealth has not abided by the terms of the Settlement Agreement, has continued to market its product under the "Community Care Rx" name, and has continued to cause confusion in the Oklahoma marketplace.  Specifically, CCHMO claims that there have been "thousands" of instances of continued use of the Community Care RX name and that such violations constitute (1) new violations of trademark law and Oklahoma common law that are not covered by the releases in the Settlement Agreement; and (2) breaches of the Settlement Agreement.[4]  Based on these violations, CCHMO is requesting a temporary restraining order enjoining MemberHealth "from using CCHMO's name, trademark and goodwill" in connection with the marketing of Medicare products in Oklahoma.

F.    Specific Relief Requested by Motion for TRO

CCHMO merely requests that it be granted a TRO enjoining Defendants from using the name "Community Care Rx" in connection with marketing of Medicare products in Oklahoma.  CCHMO does not seek, at this time, to enjoin further use of "Community Care Pharmacists Rx" and to force MemberHealth to market its product under an entirely new name.[5]   In essence, CCHMO seeks a

_____

[4] Based on the alleged breaches, CCHMO also seeks rescission of the Settlement Agreement altogether.  However, CCHMO has stated in its reply brief that it does not seek rescission as a form of injunctive relief.

[5] This was not clear from the Motion for TRO, which suggests that MemberHealth should "begin operating under a legitimate name in Oklahoma . . . (such as MemberHealth Rx) to the benefit of the present parties as well as to the Medicare beneficiaries of Oklahoma."  (*See* Mot. for TRO at 25.)  However, based on CCHMO's reply brief and statements made by counsel for CCHMO at the hearing, it is clear that CCHMO seeks the limited relief of enjoining use of the "Community Care Rx" name, which MemberHealth has already agreed to do in the Settlement Agreement.

TRO to force MemberHealth to abide by the terms of the Settlement Agreement and to cease engaging in infringement of their trademark "until the Court can hear the claim for permanent injunctive relief."   In their reply brief, CCHMO specifically requests that Defendants be enjoined from (1) displaying and disseminating papers in Oklahoma that use the "Community Care Rx" name; and (2) marketing to Oklahoma consumers on the Internet using the "Community Care Rx" name. (See Plf.'s Reply in Support of Mot. for TRO at 1.)

May 15, 2006 is the last day on which Medicare beneficiaries can change Medicare drug coverage plans until January 1, 2007.  CCHMO contends, should the confusion continue through May 15, 2006, those individuals will remain disenrolled from their hospital and medical coverage under CommunityCare's Senior Health Plan for more than seven months, if not longer. Additionally, the confusion will continue to be relevant because there is ongoing enrollment after May 15, 2006, for those individuals turning 65.

## II.    Defendants' Motion to Dismiss

Defendants have filed a Motion to Dismiss all causes of action related to trademark infringement or unfair trade practices (Causes of Action 1-4 and 6), arguing that such claims have been settled by the Settlement Agreement and are barred by the doctrines of release and claim preclusion.[6]  These are the same arguments made as part of Defendants' response to the "likelihood of success on the merits" aspect of CCHMO's Motion for TRO, to the extent the Motion for TRO is based on acts of trademark infringement or unfair competition.  The Court will address the Motion to Dismiss as a preliminary matter.

---

[6] Defendants do not move to dismiss the fifth cause of action for breach of the Settlement Agreement.

8

The Court agrees with Defendants that alleged acts of trademark infringement and unfair or deceptive trade practices occurring *prior* to the Settlement Agreement and that could have been raised in the previous litigation have been settled and, unless the Settlement Agreement is rescinded, are barred by the doctrines of release and claim preclusion.  With respect to release, the conclusion is based on Paragraph 8 of the Settlement Agreement, which provides that "CCHMO . . . does hereby release, acquit and forever discharge MemberHealth . . . of and from any and all actions, causes of actions, claims and demands of any nature asserted or which could have been asserted in Case No. 05-CV-630 TCK-FHM."  Similarly, under the doctrine of claim preclusion, it is clear that (1) there is an identity of parties in the first and second lawsuit, *see Clough v. Rush*, 959 F.2d 182, 186-88 (10th Cir. 1992); (2) the voluntary dismissal with prejudice filed by CCHMO serves as a final judgment, *see Brooks v. Barbour Energy Corp.*, 804 F.2d 1144, 1146 (10th Cir. 1986); and (3) there is an identity of causes of action between the causes of action in the first case and the causes of action asserted here, to the extent those claims arise from actions occurring prior to filing of the first lawsuit, *see Mitchell v. City of Moore*, 218 F.3d 1190, 1202 (10th Cir. 2000).[7]  *See also Mactec, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) (explaining three requirements for assertion of claim preclusion).  Thus, any claims based on actions of Defendants occurring prior to the Settlement Agreement are barred by the doctrines of claim preclusion and/or release.

The Court, however, is not persuaded that acts of alleged infringement occurring *after* the

---

[7]  At the hearing, counsel for Defendants argued that the Tenth Circuit's "transactional approach" to claim preclusion dictated that even those claims arising *after* the filing of the first case were precluded under the doctrine of claim preclusion.  This is contrary to the Tenth Circuit case explaining the transactional approach.  *See Mitchell*, 218 F.3d at 1202 ("While we have yet to decide the issue, we agree with those courts holding the doctrine of claim preclusion does not necessarily bar plaintiffs from litigating claims based on conduct that occurred after the initial complaint was filed.").

Settlement Agreement are also barred by the doctrines of release or claim preclusion.  First, the plain language of the Settlement Agreement limits the release to "any and all actions, causes of actions, claims and demands of any nature asserted or which could have been asserted in Case No. 05-CV-630 TCK-FHM."  Alleged violations occurring after the Settlement Agreement could not have been asserted in that lawsuit because they had not yet occurred.  This is in contrast to more broadly worded Settlement Agreements, which release all future claims that are related to the claims asserted in the litigation.  *See, e.g., Augustine Medical, Inc. v. Progressive Dynamic, Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999) (holding that specific language in the settlement agreement that party released claims it "may have" "relating to any acts . . . made . . . on or before the date of the Settlement Agreement" indicated that a party released not only existing claims but also claims that "related to" any actions taken by defendant on or before the date of the settlement).  Second, as a general rule, "a release only covers matters expressed therein which are in existence at the time the release is executed and does not cover subsequent claims."  *See Applied Genetics Int'l v. First Affiliated Securities*, 912 F.2d 1238, 1245 (10th Cir. 1990).

Defendants argue that, despite the general rule and the plain language of the Settlement Agreement, the release in this case actually functions to bar "all of its trademark infringement and unfair competition claims, not just those for activities occurring prior to the date of the release." (See Def.'s Resp. to Mot. for TRO at 11.)  Defendants argue that this is because CCHMO was aware of possible future claims at the time it signed the general release.  The principal case cited by Defendants in support of this conclusion is *Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367 (Fed. Cir. 1999).  In *Augustine*, the court explained that patent infringement is a continuing tort and that "each act of infringement gives rise to a separate cause of action."  *Id.* at

10

1371.  The court also held that the general rule that each violation gives rise to a separate cause of action "cannot override the unambiguous language of a settlement agreement that releases all possible future claims related to the maters settled by the agreement." *Id.* at 1372.  Thus, the holding that the claims in that case were barred by the settlement turned on the precise language of the Settlement Agreement, which was distinguishable from the language at issue in this case because it clearly extended to future claims so long as those claims were "related to" the prior litigation. Another case cited, *Cadence Design Systems, Inc. v. Avant! Corp.*, 57 P.3d 647 (Cal. 2002), is a California Supreme Court case regarding misappropriation of trade secrets.  Specifically interpreting the Uniform Trade Secrets Act ("UTSA"), the court held that "a claim for misappropriation of a trade secret arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation . . . . Each new misuse or wrongful disclosure is viewed as augmenting a single claim of continuing misrepresentation rather than as giving rise to a separate claim." *Id.* at 223.  The court also stated, however, that its holding was limited to construction of specific statutory language of UTSA.  *Id.*   These cases are largely inapposite and do not persuade the Court to disregard the general rule and the plain language of the Settlement Agreement.[8]

With respect to the sixth claim for relief, requesting that the Court block Defendant NCPA's trademark registration of the Community Care Rx mark, such relief is barred by Paragraph 7 of the Settlement Agreement, which prohibits CCHMO from opposing registration of the Community Care

---

[8] Defendants also cite an unpublished Tenth Circuit case, *Kennedy v. Ford Motor Co.*, 80 Fed. Appx. 102 (10th Cir. 2003), which held that a release barred a fraud claim asserted in later litigation because the "release clearly contemplates future claims" and because the parties "intended to bar all future claims related in any way to the products liability suit."  Again, the Court finds this case distinguishable because the language in this Settlement Agreement does not "clearly contemplate" future violations.

Rx mark in markets other than Oklahoma.  Thus, this claim for relief is only possible if the

Settlement Agreement is rescinded.[9]  Because the Court will not decide whether rescission is

appropriate at this time, Defendants' Motion to Dismiss the sixth claim for relief is DENIED.

Defendants' Motion to Dismiss is GRANTED to the extent the first through fourth claims

for relief are based on events occurring prior to the Settlement Agreement and is DENIED in all

other respects.[10]

## III.    Legal Standard for TRO/Preliminary Injunction

A.    <u>Traditional Test</u>

To obtain a TRO or preliminary injunction in federal court, the movant has the burden of

establishing that: (1) he will suffer irreparable injury unless the motion is granted; (2) the threatened

injury to him outweighs whatever damage the proposed injunction may cause the opposing party;

(3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial

likelihood that he will eventually prevail on the merits.  *Kiowa Indian Tribe of Oklahoma v. Hoover*,

150 F.3d 1163, 1171 (10th Cir. 1998). If the moving party satisfies the first three elements, the

standard for meeting the fourth requirement, likelihood of success on the merits, generally becomes

more lenient—the moving party need only show that the issues are so serious, substantial, difficult,

and doubtful as to make them fair ground for litigation. *Winnebago Tribe of Nebraska v. Stovall*, 341

F.3d 1202, 1025 (10th Cir. 2003).  This is known as the modified likelihood-of-success-on-the-

---

[9] CCHMO concedes in its Complaint that such relief is only possible "upon rescinding the Agreement."  (Compl., ¶ 62.)

[10] If events or evidence that predate the Settlement Agreement are, as CCHMO argues, "probative of confusion," the Court will consider such evidence on that limited basis.

merits test.

B.     <u>Heightened Standard for Disfavored Injunctions</u>

There are three types of "disfavored" preliminary injunctions that warrant a higher standard than that set forth above. They are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004). If the issuance of the preliminary injunction is disfavored, the court must employ a heightened standard, closely scrutinizing the facts "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. A party seeking a disfavored injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harm, and may not rely on our modified likelihood-of-success-on-the-merits standard." *Schrier v. University of CO*, 2005 WL 2844829, at * 5 (10th Cir. 2005).

The first type of disfavored injunction is one that alters the "status quo." The "status quo" is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.* Another source defines the status quo as the "last peaceable uncontested status existing between the parties before the dispute developed." 11A CHARLES ALAN WRIGHT ET AL., *Federal Practice and Procedure* § 2948, at 136 (2d ed.1995).

The second type of disfavored injunction is one that is "mandatory" rather than

"prohibitory." Although it poses a "vexing" question, the Tenth Circuit has stated that an injunction is mandatory rather than prohibitory if the requested relief "affirmatively requires the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Schrier*, 2005 WL 2844829, at * 5. The third type of disfavored injunction is not implicated here.

    C.    Test to be Applied in this Case

The last uncontested status between the parties is the status post-Settlement as of November 17, 2005, with MemberHealth using the agreed-upon name "Community Pharmacists Care Rx." The relief requested by CCHMO is, in essence, for MemberHealth to cease any continued or lingering use of the name "Community Care Rx." This is something MemberHealth has already agreed to do pursuant to the Settlement Agreement. This is not, therefore, an alteration of the status quo between the parties. With respect to whether the relief requested is mandatory or prohibitory, the Court concludes that the requested relief is prohibitory in that it would prohibit MemberHealth from violating the terms of the Settlement Agreement to which it has already agreed. Thus, the Court will apply the traditional TRO standard.

## IV.    Analysis - Trademark Infringement/Breach of Settlement Agreement[11]

    A.    Likelihood of Success on Merits

        1.    *Post-settlement acts of infringement and/or breaches of Settlement Agreement*

MemberHealth contends it has stopped, or at least attempted to stop, all use of the allegedly infringing name "Community Care Rx" in the Oklahoma market and that there is no need for this

---

[11] This TRO analysis goes to CCHMO's first and fifth claims for relief. Based on the Court's ruling on Defendants' Motion to Dismiss, the same evidence is relevant to both claims. The Court does not find it necessary to specifically address CCHMO's other claims for relief.

second lawsuit at all.  At the hearing, CCHMO focused its evidence on three specific post-settlement acts of infringement and/or breaches of the Settlement Agreement to justify the imposition of injunctive relief:  (1) introductory letters that were allegedly sent to approximately 35,000 Oklahoma consumers in or around mid-February 2006 that used the "Community Care Rx" name twenty times (Plf.'s Hrg. Ex. 10);[12] (2) enrollment packets that were allegedly sent to approximately 35,000 Oklahoma consumers in or around the end of February/beginning of March 2006 that used the Community Care Rx name on the outside envelope, the return envelope, and throughout various materials contained in the packet (Plf.'s Hrg. Ex. 9);[13] and (3) the Internet website, which CCHMO claims fails to sufficiently inform Oklahoma consumers of the differences between "Community Care Rx" and CCHMO. (Plf.'s Hrg. Exs. 52-56.)

MemberHealth argued at the hearing that any written materials sent to Oklahoma after January 20, 2006 containing the "Community Care Rx" name were mistakes or were the result of printing errors.  MemberHealth has submitted three enrollment packages similar to CCHMO's Exhibit 9, which are addressed to Oklahoma addresses and which contain the proper "Community Pharmacists Care Rx" logo throughout (*See* Def.'s Hrg. Exs. 16-18.)  MemberHealth argues that it is pure speculation that 35,000 Oklahoma consumers received the packet identified as CCHMO's Exhibit 9, and that, to its knowledge, most Oklahoma consumers received the correct package, as evidenced by its submitted exhibits.

The Court concludes that CCHMO's evidence of the introductory letters and enrollment

---

[12]  CCHMO's hearing Exhibit 10 has a postmark date of February 17, 2006, and is dated January 24, 2006.

[13]  CCHMO's hearing Exhibit 9 has a postmark date of February 28, 2006.

packets sent around February 2006 could potentially constitute post-settlement acts of infringement and/or breaches of the promise in the Settlement Agreement to "avoid confusion" among the two companies.  The evidence currently before the Court conclusively shows that one Oklahoma senior received an enrollment packet containing numerous references to "Community Care Rx" (including a logo on the front cover, the return envelope, and the booklets contained inside the packet) in late February 2006.  Given the nature of mass mailings, it seems unlikely that this was an isolated incident and seems more likely that several other Oklahoma consumers received this same packet. Further, the packet in the evidentiary record contains intermingling of the two names to a significant degree, including the main envelope, the return envelope, on the outside cover of the "Formulary" packet, and in the text on the outside cover of the "Pharmacy Directory."  The Court finds there are enough instances of use of "Community Care Rx" to cause confusion between CCHMO's product and MemberHealth's product, particularly if the packet was received after or in connection with the introductory letter containing only the "Community Care Rx" name.  While the Court does not doubt the veracity of MemberHealth's assertions that any such intermingling was the result of printing or mailing errors, this does not alleviate the problem.  As noted by CCHMO, at least one goal of the Settlement Agreement was to eliminate confusion between the two companies during this crucial marketing blitz occurring from January to May 2006.  If one of the mailings during this time period reached 35,000 consumers and contained the significant intermingling of the two names, this could impact the Oklahoma market and constitute either a breach of the Settlement Agreement's promise to take necessary action to avoid confusion or an act of infringement in the Oklahoma market.  The three enrollment packets submitted by MemberHealth as evidence that Oklahomans did receive the correct materials are addressed to Oklahoma addresses but do not contain a post-marked date.  This

makes it impossible to determine when and if they were actually sent or received by Oklahoma consumers.  These packets do not convince the Court that only isolated instances of the incorrect mailings occurred.

Evidence regarding breach of the Settlement Agreement and/or infringement based on MemberHealth's Internet website marketing is less convincing.  CCHMO's chief complaint seems to be that there is no general "disclaimer" that initially appears for Oklahoma residents on the opening page or pages of the website and that explains the differences between the two companies. First, the Court observes that it is a more difficult proposition to tailor an Internet website to a specific geographic consumer than a targeted mailing because the website is a marketing tool used simultaneously for the entire country.  Therefore, the Court does not agree with CCHMO that MemberHealth has violated the Settlement Agreement or trademark law because *only* the CommunityCare Rx name is used on the "first level" or opening page of the website. MemberHealth's product is, in fact, known by the "Community Care Rx" name in all states except Oklahoma, and  MemberHealth is still free to market its product as Community Care Rx to the rest of the country, so long as such marketing "avoids confusion" with CCHMO among Oklahoma consumers.

Second, MemberHealth has taken steps to "avoid confusion" between MemberHealth and CCHMO on the website.  For example: (1) on the "Enroll Online" page, when one chooses Oklahoma, the name of the plan options change to Community Pharmacists Care Rx; (2) on the "Pharmacy Locator" page, there is a specific link for Oklahoma residents at the top of the page; (3) on the "Enrollment Information" page, there is a link for an Oklahoma Pre-Enrollment Cover Letter and an Oklahoma Privacy Notice; and (4) on the "Member Information" page, when one chooses

17

Oklahoma, all accessible forms contain the Community Pharmacists Care Rx logo.[14] (*See* Plf.'s Hrg.

Exs. 52-56.)  CCHMO cited no evidence of actual confusion caused by the website.

The Court is not convinced that a lack of general disclaimer is likely to constitute an act of

trademark infringement in the Oklahoma market.  Nonetheless, after careful review of the website,

the Court does believe that the lack of an initial "Oklahoma" link with an explanation of the different

companies' names could constitute a failure to take necessary action to "avoid confusion" among

Oklahoma consumers, in possible breach of the Settlement Agreement.  In sum, the Court finds only

very limited potential violations regarding MemberHealth's marketing on the Internet website.[15]


2.      *Protectibility of Mark*[16]

CCHMO does not own a federal or state registration for the name "CommunityCare" (the

"Mark").  This is not required under the law in order to have a protectible trademark.  *See*

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir. 1991)

("It is elementary that service mark ownership is not acquired by federal or state registration.

---

[14]  The Court's analysis of the website is as it existed on May 1, 2006, two days before the hearing.  As of May 1, 2006, MemberHealth had made some additional changes to the website to attempt to address concerns raised in the Motion for TRO.

[15]  In addition to the three evidentiary items raised at the hearing, CCHMO also submitted written evidence of other violations, such as incorrect banners in Oklahoma pharmacies as late as February-April 2006 and mistakes made during "secret shopper" calls to MemberHealth's information line.  Upon being notified of such problems, MemberHealth appears to have taken steps to correct these problems, and the Court is not convinced that any would give rise to potential causes of action.  In any event, the evidence presented at the hearing provides the basis for the TRO issued here, and the Court will not address the other evidence.

[16]  The next two sections of analysis are relevant only to the likelihood of success on the merits of the trademark infringement claim and not the breach of contract claim.

Rather, ownership rights flow from prior appropriation and actual use in the market.") CCHMO's "CommunityCare" mark is most likely a "descriptive" mark, which is not protected by trademark "except where it has acquired a secondary meaning through long and exclusive usage" such that the "word has come to mean the article is [the business's] product." *See Bell v. Davidson*, 597 P.2d 753, 755 (Okla. 1979).   CCHMO argues that the Mark has acquired such secondary meaning and has therefore become distinctive through use.   Based on the evidence before the Court, the Court concludes that CCHMO has used the Mark continuously in Oklahoma from 1993 to the present to distinguish CCHMO's products and services.   In addition, since 1998, the Mark has been used to indicate the source of CCHMO's Medicare coverage offered to Oklahoma consumers.   The Court concludes, for purposes of the TRO, that CCHMO can likely show that "CommunityCare" has acquired a secondary meaning in the Oklahoma market, such that "in that trade and to that branch of the purchasing public the word or phrase has come to mean that the article is his product." *Educational Dev. Corp. v. Econ. Co.,* 562 F.2d 26, 29-30 (10th Cir. 1977).

### 3.     *Likelihood of Confusion*

Where a trademark is protected only by its "secondary meaning" status, the test of its infringement is whether a "likelihood of confusion exists between the protected mark and its copy." *Bell*, 597 F.2d at 755.   "[T]he test in determining whether there is likelihood of confusion between two opposing marks is whether they are sufficiently similar to deceive an ordinary prudent buyer." *Id.*   Tenth Circuit law discussing the federal Lanham Act is also helpful in explaining the likelihood of confusion test.   "The key inquiry in a trademark infringement case is the likelihood of confusion between two similar marks." *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 832-33 (10th Cir. 2005).   The Tenth Circuit has identified six factors that serve as a guide for evaluating the

19

likelihood of confusion: (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) evidence of actual confusion; (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (e) the degree of care likely to be exercised by purchasers; and (f) the strength or weakness of the marks. *Id.* The factors are not exhaustive, no single factor is dispositive, and all factors must be considered as an interrelated whole. *Id.* At all times, "the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'" *Id.* at 554 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 780 (1992)).

CCHMO has offered evidence of actual confusion occurring after the Settlement Agreement. Specifically, there have been two mistaken enrollments by Oklahoma seniors in MemberHealth's Part D Plan as a result of the confusing names. At one of MemberHealth's enrollment seminars in December 2005, one Oklahoma senior unwittingly enrolled. MemberHealth contends this individual arrived late and missed the announcement about the two entities. Upon being informed of the problem, MemberHealth allowed him to disenroll. Another senior unwittingly enrolled in MemberHealth's Part D plan over the phone. After she realized the problem, she was also allowed to disenroll. Therefore, although problems stemming from the confusion have been corrected, these instances of accidental enrollment evidence actual confusion in the market. This evidence of actual confusion, combined with the high degree of similarity between the names, the fact that the two companies are in the same industry competing for the same customers, and the fact that the target market for both companies is senior citizens, who may be less able to exercise a high degree of care in choosing the product, easily convinces the Court that there is a likelihood of confusion between the name "CommunityCare" and "Community Care Rx."

B.     Irreparable Injury

A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because damages would be inadequate or difficult to ascertain. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989).   Where trademark infringement is alleged, a showing of irreparable injury is made once the plaintiff establishes a likelihood of success on the merits.  This is because, by its very nature, trademark infringement results in irreparable harm because "the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated."  *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992).  CCHMO has made a sufficient showing of irreparable injury as to the trademark infringement claim.  With respect to the breach of contract claim, CCHMO has also made a sufficient showing of irreperable harm that it will suffer if MemberHealth does not abide by the terms of the Settlement Agreement.  Rather than suffer only financial loss, CCHMO will suffer similar loss of goodwill and reputation in the event the contract is breached.

C.     Balance of Harms to Parties

In this balancing analysis, the Court may not consider harm that could eventually be compensated by money damages.  *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004).  CCHMO's potential irreperable harm is the loss of goodwill and diluting of its trademark.  Based on the relief requested, which is essentially limited to forcing MemberHealth to abide by the terms of a contract to which it has already agreed, MemberHealth cannot show any harm that it will incur.  Rather than argue that it will incur harm, MemberHealth argues that it has already ceased, and desires to cease, dissemination or displaying of written materials with the Community Care Rx

21

logo in order to protect its own presence in the Oklahoma market.

With respect to any changes to the website, the Court concludes that no irreperable harm will be occasioned to MemberHealth by ensuring that its Internet marketing to Oklahoma consumers "avoid[s] confusion" among Oklahomans, as it is required to do by the terms of the Settlement Agreement.  At the hearing, MemberHealth in fact agreed that it was willing to discuss additional changes to the website and that it wished CCHMO had requested such changes prior to filing the instant lawsuit.  The Court therefore concludes, based on the very limited relief requested in the TRO, that the balance of harms tips in favor of CCHMO.[17]

D.    Harm to the Public Interest

The Court concludes that the public interest is clearly the most important factor in this case, since Oklahoma senior citizens stand to lose their Medicare coverage if there is confusion between the two companies.  *See id.* at 730 (explaining that the "public interest in a trademark case . . . is most often a synonym for the right of the public not to be deceived or confused").  If the very limited injunctive relief requested, which is essentially that MemberHealth cease to use the Community Care Rx name, is not granted, the Court concludes that the consuming public may be significantly harmed due to confusion between the two names.  The protection of senior citizens against the unwitting loss of substantial Medicare benefits is as compelling a public interest as the Court can imagine in a trademark case.  Unlike other product choices, this product choice could mean the difference between life and death.

---

[17] If there were more comprehensive relief requested by CCHMO, such as another name change by MemberHealth, the Court notes that the balance of harms may change significantly.

V.     **Conclusion and Issuance of Injunctive Relief**

CCHMO has clearly satisfied the last three elements of the traditional test, in part because the relief requested in the Motion for TRO merely maintains the status quo, and is essentially limited to enforcing the terms of the Settlement Agreement already agreed to by CCHMO and MemberHealth.  Having satisfied the last three elements, CCHMO is entitled to the "modified" likelihood of success on the merits standard.  For the reasons explained above in Part III.A., the Court concludes that CCHMO has at least made a showing that there are serious, substantial, difficult, and doubtful issues such that they are "fair ground for litigation" as to the first and fifth claims for relief.  The most difficult question presented is whether any acts of infringement or breaches of the Settlement Agreement have actually occurred in the Oklahoma market post-settlement.  The Court finds that CCHMO has at least made a showing that the marketing materials sent in February 2006, assuming they did reach a substantial number of consumers, could constitute a breach of the Settlement Agreement or an act of infringement.  Accordingly, the Court finds that CCHMO has met the requirements for issuance of the following TRO, which is very limited and which is expressly intended to maintain the status quo between the parties as it existed at the time of the Settlement Agreement.

Defendant MemberHealth is hereby ENJOINED from the following:  (1) displaying and disseminating papers in Oklahoma that use the "Community Care Rx" name; and (2) marketing to Oklahoma consumers on the MemberHealth website in a way that causes confusion between MemberHealth and CCHMO.  With respect to the website, the Court finds that it is necessary for MemberHealth to provide a specific link for Oklahoma residents on the opening  page or pages of the website.  The link should lead to a general explanation or "disclaimer" explaining the differences

between the two companies for the benefit of Oklahoma consumers.  The Court encourages the parties to confer regarding additional modifications to the website that could be made to help avoid confusion among Oklahoma consumers.  However, the Court observes that MemberHealth has already made significant efforts with respect to Oklahoma consumers accessing the website and does not believe substantial changes, in addition to the change ordered, are necessary to avoid confusion in the Oklahoma market.

It is THEREFORE ORDERED that Plaintiff's Motion for Temporary Restraining Order and Temporary Injunction (Docket Nos. 13 and 16) is GRANTED to the extent provided herein. Defendants' Motion to Dismiss (Docket No. 12) is GRANTED in part and DENIED in part as provided herein.

Ordered this 8th day of May, 2006.

**TERENCE KERN**
**United States District Judge**